**Horace ANDERSON, Petitioner,**

v.

**STATE OF NORTH CAROLINA,**
**Respondent.**

**Misc. No. 25.**

United States District Court
W. D. North Carolina,
Asheville Division.

Heard Aug. 23 and 30, 1963.

Decided Oct. 7, 1963.

Bruce Brown, Asheville, N. C., for petitioner.

Theodore C. Brown, Jr., Staff Atty., Office of Atty. Gen. of North Carolina, Raleigh, N. C., for respondent.

CRAVEN, Chief Judge.

This is a civil action begun by application for a writ of habeas corpus. Upon issuance of the writ, the State of North Carolina responded by answer, and *two* evidentiary hearings have been held.

"Where the facts are in dispute, the federal court on habeas corpus *must* hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770, 785 (1963). (Emphasis added).

"The duty to try the facts anew exists in every case in which the state court has not after a full hearing reliably found the relevant facts." Id., 83 S.Ct. p. 759, 9 L.Ed.2d p. 788.

But, if the habeas applicant has been afforded a "full and fair hearing by the state court resulting in reliable findings", the federal judge "may, and ordinarily should, accept the facts as found in the hearing." Id., 83 S.Ct. p. 760, 9 L.Ed.2d p. 789.

Unfortunately for this court's "delicate role in the maintenance of proper federal-state relations" (Ibid), no hearing of any sort was accorded petitioner Anderson in the courts of North Carolina despite a modern and enlightened procedural machinery adequately designed to determine the basic historical facts underlying constitutional questions and to review such questions.[1] Although the federal judge may not "defer" or give "binding weight"[2] to the state courts' conclusions of law, it does not follow that his independent application of federal law to state court fact findings will necessarily depart from state court conclusions of law.

Since there were no state court findings of fact with respect to the alleged unconstitutionality of petitioner's confinement, this court is now compelled to supply them.

A "plenary", "evidentiary", "trial-type"[3] habeas corpus hearing

---

1. N.C.Gen.Stat., § 15–217 et seq.

2. Brown v. Allen, 344 U.S. 443, at 506, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

3. Adjectives modifying "habeas corpus" proceedings in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770.

ought to be conducted in an atmosphere of a search for truth by the presiding judge with the fair-minded assistance of the responding government rather than a strictly adversary proceeding. This is so because no enlightened government, whether federal or state, ought be assumed to wish to continue the confinement of one of its citizens except in accordance with law. A completely adversary atmosphere with too rigid adherence to rules of evidence can sometimes discourage even competent questions and exclude relevant information. Moreover, it ought not be forgotten that "the common law rules of evidence grew up exclusively in jury trial, and do not apply 'ex stricto jure' in any tribunal but a jury-court." 1 Wigmore on Evidence, Section 4(b), p. 27 (3d Edition).

Even so, the evidence problems which arose at the hearings can be avoided. The decision of the court does not turn on the report of the prison psychiatrist or upon the testimony of petitioner's former counsel with respect to any confidential communication, and it is not necessary to rule on the competency of such evidence.

From competent evidence to which no objection was taken, the court finds the facts to be as follows:

1. That about 2:30 P.M. on the 23rd of October, 1961, petitioner Horace Anderson was arrested upon a warrant for assault on an eight year old minor female child, and was subsequently released about 6:00 P.M. of the same day upon a $1,000.00 bond.

2. That about 8:30 P.M. on October 30, 1961, petitioner Horace Anderson was again arrested, put in jail, and on the following morning, October 31, warrants charging him with incest and rape were served on him. All warrants (October 23 and 31) arise out of the same occurrence alleged to have happened on October 21.

3. About the first of November, the Honorable Grover C. Mooneyham was contacted by Horace Anderson's father, and they discussed employment to represent Horace Anderson; Mooneyham interviewed Anderson in jail "the first part of November"; because of lack of money, Mooneyham was not employed, but was subsequently appointed by the Superior Court of the State of North Carolina to represent the defendant—the said appointment being made on November 21, 1961.

4. That Horace Anderson was indicted for the capital crime of rape on or about November 21, 1961.

5. That Grover C. Mooneyham discussed the case with Horace Anderson fifteen or twenty times; that he inquired for witnesses who might be favorable to Horace Anderson, and sought and received permission of the State to confer and talk with the prosecuting witness, Patricia Anderson, and her mother, wife of the defendant, and talked with them; that after his appointment as counsel for the defendant, Mr. Mooneyham moved the court for a continuance, which continuance was granted for the purpose of giving Mooneyham sufficient time to study the case and to understand it and competently advise his client; that as a result of Mooneyham's motion for a continuance, the case was continued from the November 20 term until the December term, pursuant to N.C.G.S. § 15–4.1.

6. On the 14th day of December, 1961, Horace Anderson was brought to the superior courtroom of Buncombe County, and on the *morning* of that day entered a plea of not guilty; the trial was again postponed until January 8, 1962.

7. At 4:30 P.M. on the same day, Anderson pleaded guilty to a lesser offense.

8. At the time of entry of the guilty plea, December 14, 1961, the record shows that the Solicitor stated to the court that "(t)he defendant, through

his counsel, in open court, tenders to the state a plea of guilty of assault upon a female with intent to commit rape, which plea the state accepts." (Tran. p. 1) [4] Immediately thereafter, and sufficiently important to be set out verbatim, occurred the following: "The Court: Is that correct? That is the plea you enter?"

"The Defendant: Yes." (Ibid)

"The Court: You do it freely and voluntarily, knowing the probability is you will get an extended prison term, is that right?"

"The Defendant: Yes, sir." (Id. at p. 2)

9. Thereafter, the court proceeded to hear evidence going to the question of guilt for the purpose of determining proper punishment.

10. After the evidence had been heard, Mr. Mooneyham addressed the court asking for leniency, and in the course of his remarks, advised the court that the defendant was submitting to this lesser offense (as compared with the capital felony) because of his prior record, *and that he still asserted his innocence.* (Tran. p. 10) Whereupon it appears the court said in response: "I thought this man was pleading guilty. I am not finding him guilty. I don't want any misunderstanding about that because he has plead guilty now, and if there is any misunderstanding, I want him to withdraw it and continue the matter."

"Mr. Mooneyham: No, sir, he knows he has plead guilty."

"The Court: I don't want him to go out and say he was sentenced for something he didn't do." (Tran. pp. 10 and 11)

11. Thereafter, the court afforded the defendant the right of allocution. Nothing was said by the defendant with respect to his plea or with respect to whether he was truly guilty or innocent.

12. After the defendant had spoken at some length, the court again addressed him in words as follows: "Well, you understand you have plead guilty to this thing. That is what you wanted to do, wasn't it?"

"The Defendant: Yes." (Tran. p. 13)

13. Thereupon, the court sentenced the defendant to a term of not less than 12 nor more than 15 years, and the defendant was immediately taken back to jail.

14. The defendant is alert and his demeanor is such as to convey the impression that he grasps and understands the nature of the present habeas corpus proceedings. During cross-examination and questioning by the court, his responses to questions indicated complete understanding of the matters being inquired into. He has a sixth grade education and is not lacking in intelligence. According to Dr. Sargent, prison physician, he is "not quite right." But, also according to Dr. Sargent, he appreciates and understands the nature of the proceedings and is not "insane." He knows and understands the difference between right and wrong. At the time of sentencing he understood the significance of the relevant facts and the nature of the proceeding.

15. No evidence is forthcoming from the petitioner to seriously put in issue the question of his mental competence at the time of his trial; his own medical witness negates the contention.

16. Anderson pleaded not guilty to the capital offense at 11:30 A.M. on the 14th of December and pleaded guilty to the lesser felony at 4:30 P.M. the same day. The evidence does not make entirely clear why he changed his mind. But, immediately before his plea of guilty on the afternoon of December 14, 1961, the Solicitor and members of his staff

---

**4.** Refers to the transcript of the State court trial proceedings.

talked with the prisoner in jail *in the absence of his counsel* but apparently with counsel's consent. Although no specific words of threat or promise were used, it is fair to say that the following impression was conveyed to the petitioner Anderson and was intended to be conveyed:

> That he was charged with a capital offense and that the Solicitor would put him on trial for his life with the probability of a sentence of death unless Anderson agreed to plead guilty to the lesser offense of assault with intent to commit rape, and that if he so pleaded he could not be imprisoned under the law for longer than fifteen years and, in all probability, the presiding judge would give him as little as two to three or three to five years in prison. Anderson was further assured that the Solicitor "would talk to the judge." It does not appear that the Solicitor ever did so.

17. Anderson exhausted all state court remedies and never received a state court hearing to review the constitutionality of his sentence and judgment of imprisonment.

■ Only one of Anderson's several allegations of unconstitutionality of his imprisonment has sufficient merit to require discussion—his contention that he was effectively denied his right to counsel. At the time of trial, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), had not been decided. But, even then, since he had been indicted for a capital crime, he was constitutionally entitled to counsel at every stage of the proceeding terminating in his guilty plea to the non-capital felony. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); N.C.G.S. § 15-4.1.

There is thus a causal relationship between the imprisonment for the non-capital felony and the alleged denial of counsel in the capital case—as will more clearly appear hereinafter.

The right to counsel is not merely a matter of form. It can be waived by the defendant—but not by his counsel. It is, therefore, irrelevant that counsel may have consented for the Solicitor to conduct—in counsel's absence—what amounted to a pre-trial conference with the prisoner in jail. Unquestionably, the most important part of the proceedings against Anderson occurred in jail—when his counsel was not present to advise him. It was at that time and place that the decision was made to plead guilty to the lesser felony. Otherwise, he would not have been returned to the courtroom —for the jury had long since gone, and his trial had been set for the next term. What happened in the courtroom was to merely make a formal record of a decision arrived at upstairs in jail in a conference between the Solicitor and the defendant. Counsel's presence at the sentencing (he was sent for by the Solicitor) does not give it validity. The most he could have done was to ratify a decision previously made. More than this is implicit in the right to counsel: petitioner was entitled to have counsel aid and help him *in making the decision.*

Compromise pleas in criminal cases occur very frequently in the administration of the criminal law. Seldom are such instances reflected in the law books for the simple reason that both sides are by hypothesis usually satisfied, i. e., the defendant has escaped a greater penalty, and the state has avoided a protracted and expensive trial.

The constitutional validity of the time-honored compromise plea [5] is assumed for purposes of this opinion. But, a compromise necessarily involves negotiation,

---

5. Can a person charged with crime be constitutionally denied the right to weigh his chances and accept a lesser penalty, e. g., escape the death sentence? Apparently he has the right to make such a Hobson's choice if effectively aided by counsel.

Martin v. United States, 256 F.2d 345 (5th Cir. 1958); Tabor v. United States, 203 F.2d 948 (4th Cir. 1953). And see: Edgerton v. North Carolina, 315 F.2d 676 (4th Cir. 1963); 22 C.J.S. Criminal Law § 423(5).

and here Anderson was without the assistance of his lawyer in negotiating the compromise with the Solicitor. Not infrequently counsel succeed in getting the Solicitor to affirmatively recommend to the court a specific sentence in return for a guilty plea. It is not unheard of for the trial judge to be informed of the negotiations and to indicate whether or not he will likely follow the Solicitor's recommendation. Sometimes Solicitor and counsel relate the facts to the judge, and he will then indicate the probable sentence in the event of a plea of guilty. If the sentence comes out as indicated, everyone is satisfied. If the judge changes his mind after learning more of the case, he need only permit the withdrawal of the guilty plea. The trial may then proceed as if the negotiations had never occurred—preferably before another judge and at another time.

Unquestionably petitioner Anderson could not bargain on equal terms with the Solicitor. The conference in the jail was inherently unfair, and the agreement made there infects all subsequent proceedings.

■ It is idle to speculate whether petitioner's counsel could have, if present, worked out a better deal with the Solicitor. The point is Anderson was entitled to have him *try*. For lack of effective counsel at a "critical" stage of the proceedings against him, those proceedings are constitutionally defective. White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

Petitioner Anderson is unlawfully confined and is entitled to be released unless the State of North Carolina elects to re-try him for either the capital offense or the lesser felony within a reasonable period of time. Unless the Attorney General of North Carolina shall file with this court within thirty days a certificate of the State's election to proceed with re-trial, an appropriate order will be entered commanding Anderson's release from imprisonment.